BUETER v. BUETER.

1.   In this case the evidence examined, and *held* to sustain the allegation of respondent that she executed the articles of separation between herself and her husband, appellant herein, under menace, entitling her to rescind, and to support the judgment of the court below in annulling and setting the same aside.
2.   In this state a wife, justified by her husband's misconduct towards her in living separate from him, may maintain an independent action against him for her support, without regard to the question of divorce.
3.   In such an action, if the wife is destitute, the court has power to include in its judgment an allowance of attorney's fees, as necessaries for the wife.

(Syllabus by the Court.   Submitted Feb. 14, 1890.   Opinion filed May 1, 1890.)

Appeal from district court, Lawrence county; Hon. CHARLES M. THOMAS, Judge.

Action to set aside and annul articles of separation between husband and wife. Judgment for plaintiff. Defendant appeals. Affirmed.

The facts are stated in the opinion.

*Grvnville G. Bennett,* for appellant.

The evidence of duress upon which a contract may be avoided, must be clear and conclusive. Davis v. Fox, 59 Mo. 125; Brown v. Peck, 2 Wis. 261. Threats, to constitute menace, under our statute, must be such as to strike with fear a person of common firmness and constancy of mind; duress, by mere advice or persuasion, is unknown to the law. Comp. Laws § 3504. Barnett v. French, 1 Conn. 354; Harmon v. Harmon, 61 Mo. 227; Bosley v. Shamer, 26 Ark. 280. State v. Slade, 70 N. C. 55. Miller v. Miller, 68 Pa. St. 486. To constitute the ground for the avoidance of a contract it must clearly appear that threats caused the contract and that the constraint occasioned was imminent. Taylor v. Jacques, 106 Mass. 291. In the contract sought to be avoided, all the elements of a legal contract are present. § 876 Civil Code, *et seq.* Husband and wife may contract *inter sese.* § 78 Civil Code.

Alimony and attorneys fees should be allowed in no other suits between husband and wife than divorce suits, and the judgment of the court in this case decreeing alimony and attorney fees to the wife is clearly error.

*McLaughlin & Steele,* for respondent.

Duress, in its more extended sense, means that degree of constraint or danger either actually inflicted or threatened, or impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. Brown v. Peirce, 7 Wall 214; 12 Wall 157; United States *et al* v. Huchabee, 16 Wall 431; 1 Storey, Eq., Jur., § 239; Forsbay v. Ferguson, 5 Hill 158; Eadie v. Slimmons, 26 N. Y. 11.

The district and supreme courts have common law and chancery jurisdiction, and have powers in a case like the one at bar to allow suit money and attorney fees. Highly v. Ferris, 20 Wall, 381; 2 Bishop on Marriage and Divorce, § 385 *et seq.* Equity can decree alimony as the principal relief in a proper case, and may decree alimony unaccompanied by divorce. 2 Bishop on Marriage and Divorce. § 350 *et seq.*

KELLAM, J. This was an action brought by respondent

against appellant in the district court of Lawrence county, to set aside and annul certain articles of separation between said parties, who are husband and wife, and for other specific relief, hereinafter noticed, alleging in her complaint that she signed the articles reluctantly and unwillingly, under menace and duress exercised towards her by appellant; that she revoked and renounced said articles of separation, and claims all her rights as the lawful wife of appellant, and offers to return and be reconciled to him whenever it will be safe for her to do so. The complaint further charges extreme and repeated acts. of violence towards respondent, for a long time before and at the time of signing such articles; alleges that she is old, infirm, and destitute, and that appellant is in possession of all the property accumulated by their joint industry and economy. The other specific relief asked for was a decree requiring the appellant to pay her monthly a reasonable allowance for her support, and a reasonable sum as attorney's fees and expenses of the action. The appellant answered, denying all the allegations of ill treatment and violence, and of menace and duress as to the execution of the articles of separation, and set up such articles as a defense to the action. Upon the trial the court decreed the articles of separation null and void, because obtained from respondent by menace and duress; and, further, that appellant should pay to respondent, or to the clerk of the court for her use, for her support and maintenance, the sum of $40 per month, until the further order of the court, and the sum of $150 for attorney's fees in the action. From this judgment and decree the appellant appeals.

All the alleged errors which are brought to the attention of this court by the assignment and the record may be considered under two distinct heads: (1) Is the evidence sufficient to support and justify the court in its decree setting aside and annulling the articles of separation between appellant and respondent? and, if so, (2) had the court jurisdiction to entertain so much of this action as sought to compel appellant to make an allowance for the support of respondent?

Does the evidence show that these articles of separation

were executed by respondent under the coercion of menace and duress? "Duress" is declared by our statute (Section 3504, Comp. Laws) to consist in (1) unlawful confinement of the person of the party, or of husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband or wife; (2) unlawful detention of the property of any such person; or (3) confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harrassing or oppressive.

By Section 3505, menace consists in a threat (1) of such duress as is specified in the first and third subdivisions of the last section; (2) of unlawful and violent injury to the person or property of any such person as is specified in the last section; or (3) of injury to the character of any such person.

Much of the evidence tending to show violent and active cruelty towards respondent by appellant did not immediately connect such acts with the execution of this agreement. Indeed, many of them occurred months before, and had no relation to the agreement, or its execution, and can only be considered in connection with their probable, or, rather, inevitable, effect upon respondent, in inspiring a fear of their repetition. A woman who had never known or felt her husband's hand in violence against her would doubtless be less moved by an angry threat than one who, remembering the experience of the past, would at once connect the threat with its execution, and instinctively measure its meaning by the recollection of the bruises she had before received. The testimony of the respondent, Margaret Bueter, Mrs. Rewman, her daughter, and at least five or six other witnesses, establishes beyond doubt the violent and wicked conduct of appellant towards respondent. He had himself educated her to know and appreciate the force and meaning of his threats. The proof of his general ill-treatment of respondent is so abundant and convincing that we shall not refer to it in detail. In the examination of respondent; the following questions and answers occur: "Question. What was his conduct just before that, [signing articles of separation,]

for some days, toward you? Answer. Cruelness, meanness and violence. He kicked me with his boots, that I was black and blue all over, days and days before,—you might say for months. Q. What was the last time before signing; how long before? A. That same morning. Q. (By the Court.) Did he make any threats against you? A. Yes, sir; he did. Q. (By the same.) In order to make you sign it? A. Yes, sir. Q. (By the same.) What threats did he make against you? Did he threaten to do any violence to you if you did not sign it? A. Yes, sir. Q. (By the same.) What did he say? A. He knocked me down, and kicked me. Q. (By the same.) Did he kick you because you would not sign this writing? A. Yes, sir; that is what he did." We make the following extract from the testimony of Mrs. Rewman: "Question. What took place between them as to the signing of that [articles of separation] in your presence? Answer. I know he abused her when she said she would not sign it. Q. What do you mean by abuse? A. Well, he slapped her, and pulled her around. Q. Do you know who brought these articles of separation to the house? A. No, sir; I do not. I first saw them—papa handed them to me and asked me to read them to mama. I read them to her. I started to read them. I don't know whether I finished them or not; and she said she would not sign them at the time I read it. My mother cannot read English writing. I don't think I finished reading them. I read over half through, though. She listened to it, and she said she wouldn't sign them, and did not care to hear any more after she had heard half of it. Q. Tell the judge why she signed the articles after her expressing her unwillingness. A. Because there was not any peace at home unless she would sign them,—to make peace she signed them. There would be no peace at the house unless she signed them. Q. (By the Court.) How long after they were brought to the house was it before she signed them? A. It was two or three days. I think he brought them here on Tuesday, and they were signed on Thursday, I think. Q. During the interval from the time they came to the house until they were signed by your mother, state what

you know about any pressure being brought to bear upon her, either by violence or otherwise, to induce her to sign them. A. I know he kicked her once when they quarreled about her not signing the paper, and she said she would not sign it, and in the evening of that night, before she signed them they were quarreling, and he slapped her and abused her. Q. What was the condition of your mother at the time she signed the paper? Was she in good health or unwell? A. She was feeling very poorly."

There is considerable other testimony in the same line, though possibly not quite so directly connected with the execution of these papers; and while we are not disposed to limit the force, as evidence, of the certificate of the officer who took respondent's acknowledgment, and while her evidence cannot be taken to impeach his certificate, it strongly corroborates the testimony of respondent and her witnesses as to her reluctance to signing the agreement. He says there was much contention and angry talk between them. and that he must have been there an hour, at least, before she agreed. Without more particular discussion, we content ourselves with saying generally that the evidence bearing upon this immediate question, carefully read and thoughtfully considered, impresses us as it did the trial court; and we are fully convinced that the execution of the articles of separation of April 15, 1884, by the respondent, was caused by threats of bodily injury, and accomplished by menace, as alleged in the complaint.

Having reached the conclusion that the court below was right in annulling the articles of separation, we approach the next question with more reluctance, because it involves a question of jurisdiction never before, to our knowledge, presented to the courts of this state or territory. The proposition is clean cut, and, plainly stated, is this: Can a wife, justified by the conduct of her husband towards her in leaving her home, maintain an independent action against her husband for her maintenance? And can a court of equity entertain such an action and by its decree compel the husband to make provision for her support during such separation? It must be conceded that little sup-

port is found for such an action in the books of the text-writers and the adjudications of the courts, in number, at least, preponderate against it. The question is important. It is squarely presented in this case, and it must be answered.

Both at common law and under our statute the wife is entitled, by virtue of the marriage contract, to support and maintenance from her husband, and he, in turn. is under obligations to supply such support and maintenance, commensurate with his ability, until relieved from such duty, either by the law, or by the voluntary act of the parties to the contract. Section 2588, Comp. Laws. But while this mutual and correlative duty and right, as between husband and wife, have been recognized by the courts from an early day, it was never in the English courts, I think, not even the ecclesiastical, allowed as an independent right or cause of action. It was only asserted and allowed as an incident or appendage to some other proceeding, generally for a divorce. In Ball v. Montgomery, 2 Ves Jr. 191 Lord LOUGHBOROUGH said: "I take it to be now the established law that no court, not even the ecclesiastical court. has any original jurisdiction to give a wife a separate maintenance. It is always as incidental to some other matter that she becomes entitled to a separate provision;" and this was probably the nearly uniform holding of the English courts, except that upon *supplicavit* for security of the peace, against her husband, it was said, in the case just cited, the wife might be allowed a separate maintenance, if necessary that she should live apart from her husband; but even this authority was questioned in subsequent cases, and it is very doubtful, if not altogether improbable, that a case like the one at bar could have been maintained in any of the courts of England. In Bishop on Marriage and Divorce, the author declares that the doctrine and practice of the English courts were strongly against it, and to the same purpose is the declaration of Judge STORY in the second volume of his Equity Jurisprudence, § 1422.

An examination of the earlier American cases shows a strong disposition to follow the same rule, but it did not command universal obedience. In an early Virginia case, (Purcell

v. Purcell, 4 Hen. & M. 507,) a broader jurisdiction was asserted;
and it was there held that if a husband abandon his wife, and
separate himself from her, without any reasonable support, a
court of equity may, in all cases, decree her a suitable mainten
ance and support out of his estate, upon the very ground that
there is no adequate or sufficient remedy at law in such a case.
Mr. Bishop speaks disapprovingly of the chancellor's conclu-
sion as to the jurisdiction of a court of equity in such a case,·
but Judge Story says of it:   "There is so much good sense and
reason in this doctrine that it might be wished it were gener-
ally adopted."    Story, Eq. Jur. § 1423*a*.    The same doctrine
was again recognized and maintained in Virginia in Almond v.
Almond, 4 Rand. (Va.) 662.    In South Carolina the same rule
as to the jurisdiction of a court of equity is asserted in Prather
v. Prather, 4 Desaus. Eq. 33;   and, later, in the same state, in
Rhame v. Rhame, 1 McCord, Eq. 197.    In Alabama the rule is
broadly stated, in Glover v. Glover, 16 Ala. 440, to be:   "Where
a husband abandons his wife without just cause, and casts her
upon society destitute of the means of subsistence, a court of
chancery, as an original ground of equity, will entertain a bill
filed against him for alimony;"   and this case was followed in
Kinsey v. Kinsey, 37 Ala. 393.    In Butler v. Butler, 4 Litt.
(Ky.) 202, this question was elaborately reviewed, and in his
opinion Judge MILLS says:   "Suppose the case of abandon-
ment by the husband, and that the separation is complete, with-
out any sentence, and that the wife is left to the humanity of
the world, without support, has the chancellor, without the
statute, or in cases not embraced by it, no authority to direct a
portion of the husband's estate, to be set apart for the
support of the wife, leaving the marriage contract as
obligatory as ever?   This is a question different from the power
of separation, and deserves further consideration.   *  *  *  It
is clear that strong moral obligations must lie on every hus-
band, who has abandoned his wife, to support her.    The mar-
riage contract and every principle binds him to this.   To fail to
do it is a wrong acknowledged at common law, though that
law knows no remedy, because there the wife cannot sue the

husband. But in equity the wife can sue the husband, and it is the province of a court of equity to afford remedy where conscience and law acknowledge a right, but know no remedy."

In 1869 this precise question was before the supreme court of California, in Galland v. Galland, 38 Cal. 265; and, though the case was decided by a divided court, Judge CROCK ETT, in the prevailing opinion, says: "Whatever reason may have prevailed at common law, to induce the courts to withhold their aid from the wife under these circumstances, [separation and destitution,] none exists in this state why a court of equity should refuse to compel an offending husband to provide out of their common property for the support of an ill-used wife, who has been forced to seek protection elsewhere than under the husband's roof." Again, in Garland v. Garland, 50 Miss. 694, after a very thorough examination of this question, and the cases bearing upon it, the court in its opinion uses this language: "Courts of equity in America will always interpose to redress wrongs when the complainant is without full, adequate and complete remedy at law. Here there is no such process as *supplicavit*, nor a distinct proceeding for the restitution of the conjugal relation. If a wife is abandoned by her husband without means of support, a bill in equity will lie to compel the husband to support the wife without asking for a decree of divorce." In the case of Graves v. Graves, reported in 36 Iowa, 310, Judge COLE, delivering the opinion of the court, states the question thus: "The main question involved in the controversy is whether a court of equity has the authority or jurisdiction to entertain an action brought for alimony alone, and to grant such alimony where no divorce or other relief is sought." And after an examination of the question, and the history of its treatment by the courts, both in England and America, he concludes: "It seems to us that upon well-settled equity principles, as well as upon considerations of public policy, the action may be maintained without asking a divorce or other relief." And very recently this distinct question was presented to the supreme court of Nebraska in Earle v. Earle, reported in 43 N. W. Rep. 118. In that case, as in Galland v.

Galland, supra, it was contended—and the appellants so insists in this case—that the statute affirmatively authorizing alimony and support to the wife, as an incident or appendage to divorce proceedings, impliedly negatives the power or jurisdiction of the court to make such allowance in other cases, but in neither case was such argument convincing.    The syllabus of this case prepared by the court, says:    "The law of the land having made it the legal duty of a husband to support his wife and children, courts of equity within this state have the power, in a suit by the wife for alimony and support to enforce the dis-dischage of such duty, without reference to whether the action is for a divorce or not."

These cases, while possibly not strictly in line with the prevailing current of judicial decisions, either in England or this country, commend themselves to our judgment.    Their reasoning seems to us logical and safe, and their conclusions in harmony with the present legal *status* of married women.    A denial of such jurisdiction would seem to expose the law and the courts to the just criticism of having squarely asserted the wife's right to support from her husband, yet denying her a remedy when such support is refused.    Our statute allows the husband and wife to agree upon terms of immediate separation and, if such terms provide for the support of the wife by the husband, the courts will enforce such support, at the suit of the wife.    But how can this second agreement add to the original obligation, deliberately undertaken and assumed by him, as a part and parcel of his marriage contract?    Can a repetition of such agreement, or a further recognition of such obligation, in articles of separation, add anything to its force?    A substantial and inseparable part of the marriage contract was his under-taking to support and maintain his wife, and this obligation continued upon him while living in separation, provided such separation was justified by his own misconduct.    The law always and without reserve declares this obligation absolute.    Is it made more so by his again assenting to it in articles of separa-tion?    True, the agreement may fix the amount of support, and how it shall be supplied, but that does not affect the principle

upon which her cause of action rests. It only attempts to fix the measure of relief, which would otherwise be left entirely to the court. It is difficult to see how the agreement, which adds no duty *in specie* to that already imposed by the law. can supply a cause of action in favor of the wife, if none existed before. If the parties to this action had voluntarily agreed upon terms of separation, by which the husband was bound to support the wife, any court of equity would, without hesitation, have entertained her action to compel performance, and the court would not confine itself to the terms of the agreement, but would make such allowance as was equitable. This is nearly the language of Judge MILLS in Butler v. Butler, supra.

Marriage being the result of a civil contract between the parties, and the law positively declaring that such contract covers and imposes the obligation of support, we are unable to perceive, on any principle of reason or justice, why a wife who agrees to separate from her husband should be more favored by the law than one who clings to him in spite of his ill usage, until aged in years, infirm in body, and broken in spirit, she is finally driven from her home by his unbearable misconduct. It is no adequate response to say that the law makes the husband liable for necessaries which may be furnished the discarded wife under such circumstances. What if no tradesman would furnish such supplies, and take the risk of collecting against her husband? It would be extremely improbable that any wife could long maintain herself in that way. Such a support would be too uncertain, precarious, and humiliating. It neither meets the rights of the wife, nor the duties of the husband. It is equally unfair, unjust, and inequitable to tell the destitute, and possibly unoffending wife that the law will compel her husband to provide for her if she will couple her application for maintenance with a complaint for divorce. There may be abundant reasons, controlling with her, and which the law ought to respect, why she does not want a divorce. There may be objections in conscience,—a vital and unyielding principle and rule of her religion. She may unselfishly desire to avoid a public notoriety and scandal that would involve her children,

or she may still have such affection for, and faith in, her hus-
band as will feed the hope of his reformation and their recon-
cilation,—reasons, all of them, which the law ought not to ig-
nore or disrespect. The husband owing this duty of mainten-
ance to the wife, we perceive no good reason why she may not,
independent of any other ground, maintain an action against
him for its enforcement. In this case, the evidence shows such
misconduct towards his wife, and illusage of her, by the appel-
lant, as would, and does, in our opinion, justify the separation
and the bringing of this action. No complaint is made as to
the amount of the allowance decreed by the court, except as to
the item of $150 attorney's fees, and as to this the learned coun-
sel for appellant vigorously says: "There is no shadow of le-
gal authority for the judgment awarding plaintiff an attorney
fee of $150, or any sum whatever. No attorney fees are ever
allowed except when clearly provided by statute, or where they
are subject of contract." This allowance cannot be defended
as a substitute for statutory costs, and was not so intended by
the trial court, and in that sense is not costs at all. The stat-
ute regulates the amout of costs in any action, when allowed.
In this case the court had found from the evidence that the
wife was justified in living separate and apart from her husband,
and was entitled to maintenance during such separation; that
the husband was able to furnish such support, but refused; and
that the wife was destitute. Upon these facts is the husband's
undisputed duty to furnish necessaries. If it was necessary that
this woman have support, and necessary to bring this action to
obtain it, then the action, with its proper expense, was a nec-
essary chargable against the husband. The law furnishes no
inflexible definition of the term "necessaries." In Shepherd v.
Mackoul, 3 Camp. 326, a husband was held liable upon an attor-
ney's bill for services rendered in exhibiting articles of the
peace against him. In that case Lord ELLENBOROUGH said
that the wife "had a right to appeal to the law for protection,
and she must have the means of appealing effectually. She
might therefore charge her husband for the necessary expense
of this proceeding as much as for necessary food and raiment;"

and this rule was followed in numerous English cases. Morris v. Palmer, 39 N. H. 123, holds the same doctrine in a similar case. In Porter v. Briggs, 38 Iowa, 166, the question was whether the husband was liable for services rendered by an attorney in establishing the innocence of the wife upon a charge of adultery, made by the husband himself, in an action for divorce, and the court says: "In our opinion, he is liable for such services upon an implied promise, which the law raises, to pay therefor as necessaries for the wife, and, upon a reargument of the case, the court adhered to this opinion. In Warner v. Heiden, 28 Wis. 517, the court held that a husband who prosecuted his wife to compel her to find sureties to keep the peace, and failed to sustain the charges brought against her, was liable for the reasonable fees of attorneys employed by her to defend her against such prosecution, on the ground that such legal services were necessaries. In the case of Graves v. Graves, 35 Iowa, 310, an action very similar to the one at bar, referred to above on another branch of this case, the supreme court of Iowa affirmed the decree of the court below requiring the husband to pay an attorney's fee of $150 for services in bringing the action. These cases are sufficient to illustrate the principle, and to justify our application of it to this case. We think the attorney's fees in this case were properly considered by the court as necessaries, and as they do not appear to be unreasonable in amount, we are not disposed to disturb the decree in this respect.

The last objection appellant makes to this decree is that it provides that a failure for 30 days, on the part of appellant, to make the payments at the times required, shall be deemed contempt. This objection is not substantial. This provision adds nothing to the force of the judgment. The court makes its decree, and the law provides the means for its enforcement. If non-observance, by appellant, of the requirements of this decree would be contempt, it would be so, not because it was so recited in the judgment, but because it was an act of disobedience which the law made contempt. Punishment as for contempt is not an unusual means of enforcing orders in equity.

If at any time appellant is unable to comply with the require-
ments of the decree, and such disability has not been voluuta-
rily created by his own act, he will not be liable to be pun-
ished as for contempt. The judgment of the district court is
affirmed. All the judges concurring.

Petition for rehearing denied.