## SCHLOTHAN v. SCHLOTHAN.

(First Division. Juneau. July, 1914.)

No. 199–KA.

HUSBAND AND WIFE ☞283(2), 301—SEPARATE MAINTENANCE—RIGHT
TO—COSTS.

> It is the duty of the husband to support the wife. Where he
> deserts her and refuses to support her without any fault on
> her part, forbids tradesmen to trust her on his account, whereby
> she is in want, and the husband is able to support her, *held,* that
> equity has jurisdiction to decree separate maintenance to the
> wife, and to require the husband to pay the costs of suit, includ-
> ing an attorney's fee.

This is a suit brought by wife for separate maintenance by
the husband.

Among other things alleged in the complaint is this.:

"That defendant, without reason or provocation, left and deserted
the plaintiff on the first day of January, 1914, and has since failed,
refused, and neglected to support her, and has notified the mer-
chants of the town of Ketchikan to give her no credit whatever on
his account, and that, since that time, she has been without means
to support herself, although the defendant is amply able to support
her."

The prayer is for a decree of separate maintenance and for
attorney's fees. No divorce is asked.

Chas. H. Cosgrove, of Ketchikan, for plaintiff.
Chas. E. Ingersoll, of Valdez, for defendant.

JENNINGS, District Judge. The jurisdiction of the court
to entertain such a suit is challenged in limine; the contention
of the defendant being that, without specific statutory authori-
ty, the court is powerless to make a decree for separate mainte-
nance in a suit where no divorce is asked.

It is the duty of the husband to support the wife. The com-
mon law has recognized this obligation by providing that the
husband is liable for necessaries furnished the wife, whether
with or without his consent. This liability on the part of the
husband arises from the obligation attaching to the marriage re-

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

lation. It cannot be truly said to rest on the fiction that the wife is the agent of the husband, for the husband will be liable, even though he expressly repudiates the wife's agency. In many cases, this liability of the husband will afford the necessary relief, and the wife will not want. But how, if the husband forbids tradesmen to trust her, if no one will furnish necessaries? Is it true that, in that event, her only course is "either to starve or apply for maintenance as a pauper"? 1 Bishop on Marriage, Divorce, and Separation, p. 519. Is it true that this equity, this "conscience of the chancellor," is powerless to aid her?

It cannot be gainsaid that formerly the weight of authority denied the existence in a court of equity of such jurisdiction as is here invoked. The authorities denying the existence of the jurisdiction justify the holding by the following course of reasoning: (1) The equity court has, in reference to alimony, only those powers conferred by statute and those powers which inure to it by virtue of having succeeded to the power of the ecclesiastical courts; (2) the ecclesiastical courts never entertained jurisdiction in a matter of mere dollars and cents, and although they did grant alimony, yet it was only granted as incidental to a decree of divorce, and was never granted where a divorce was not decreed; (3) therefore, in the absence of statute, there is no such jurisdiction in equity.

Premises admitted, the conclusion is irresistible. The fallacy is in the major premise. It is not true that:

"The equity court has, in reference to alimony, only those powers conferred by statute and those powers which inure to it by virtue of succeeding to the power of the ecclesiastical court."

Equity has its own inherent jurisdiction for the securing of a right or the prevention of a wrong, where there is no other plain, speedy, and adequate remedy; and, too, it has its own inherent jurisdiction to prevent a multiplicity of suits.

In the case at bar (according to the complaint) there is no other plain, speedy, or adequate remedy than by the interposition of a court of equity. It is alleged: (1) That the desertion and failure to support are without any fault on the part of the wife; (2) that the husband has forbidden all tradesmen to trust the wife on his account; (3) that the wife is in want and unable to support herself; (4) that the husband is amply able to support the wife.

If tradesmen will not credit the wife on the husband's account, of what benefit is it to her to know that, if they would so credit her, the husband would be liable? How will that knowledge put bread into her mouth, or the mouths of her children? How can she force the tradesmen to credit her? What remedy has she? The "liberty to starve, or to be maintained as a pauper," is not a plain, speedy, and adequate remedy, such as the rule contemplates. If the tradesmen do credit her, then, in order to recover of the husband, each tradesman would have to bring a separate suit in each case and show that the goods furnished were necessaries. Here would be a multiplicity of suits, to avoid which is a recognized function of equity.

Not only that, but a rule which would deny to a wife, abused or abandoned by her husband, all redress save in the divorce court, or through the good nature of those who will furnish her necessaries on her husband's credit, is not the characteristic of an enlightened civilization, nor of a sound public policy. In Almond v. Almond, 4 Rand. (Va.) 663, 15 Am. Dec. 781, the court said:

"Suppose a husband to turn his wife out of doors, or to treat her so cruelly that she cannot possibly live with him; suppose him to persevere in refusing to take her back, or to provide a cent to feed and clothe her. Surely, in a civilized country, there must be some tribunal to which she may resort. She cannot be out of the protection of the law—an outcast, dependent upon the charity of the world, while her husband may have thousands, and she may have brought him all. I would, in such cases, unquestionably, stretch out the arm of chancery to save and protect her."

It has been argued that to admit the rule contended for by plaintiff herein would be to breed discord in families and to encourage discontented wives to abandon their husbands on slight pretexts, relying upon the courts to compel their husbands to support them. But this argument ignores consideration of the fact that the jurisdiction contended for has never been exercised, or even claimed to exist, except in cases where the abandonment, desertion, and failure to support are, in the eyes of the court, unjustifiable and without fault on the wife's part. Besides, to deny all jurisdiction in a proper case would be to encourage dissolute and unprincipled husbands—

"to abuse their wives, by a consciousness that any ill treatment which stopped short of a lawful ground for divorce was without redress in the courts. The courts must deal with human nature as they find

it, and no system of jurisprudence can be so administered as to avoid possible abuses in exceptional cases." Galland v. Galland, 38 Cal. 265.

It is the policy of the law to discourage divorces, but a rule denying jurisdiction in a class of cases such as shown by the complaint herein would promote divorces.

In Graves v. Graves, 36 Iowa, 310, 14 Am. Rep. 525, the court said:

"This wrongful conduct of the husband may be such as would (as in this case) form a sufficient ground for her divorce; yet an affectionate, devoted, and hopeful wife may still not desire a divorce, by reason of her belief that she may reclaim him, and make him worthy of her love, notwithstanding his fall. But, ·during the period of her forbearance and efforts at reclamation, she is entitled to and must have her maintenance. It seems to us, that upon well-settled equity principles, as well as upon considerations of public policy, the action may be maintained without asking a divorce or other relief."

In Earle v. Earle, 27 Neb. 277, 43 N. W. 118, 20 Am. St. Rep. 667, where the bill recited that the husband had put the wife away and had ceased to contribute to the support of herself and her child, the court said, in holding that courts of equity have power to decree a separate maintenance for a wife independently of the statute:

"There is not much to commend an alleged principle of equity which would hold that the wife, with her family of one or more children to support, must be driven to going into court for a divorce, when such a proceeding is abhorrent to her, or, in case of her refusal so to do, being compelled to submit to a deprivation of the rights which equity and humanity clearly give her; that, in order to obtain that to which she is clearly entitled, she must institute her action for a divorce, make her grievances public, which she would otherwise prefer to keep to herself, and finally liberate a husband from an obligation of which he is already tired, but from which he is not entitled to be relieved. It seems to us that a declaration of such a doctrine as the law of the land would place it within the power of every man, who, unrestrained by conscience, seeks to be freed from his obligations to his wife and family, by withholding the necessary comforts and support due them, to compel her to do that for him which the law would not do upon his own application."

In Bueter v. Bueter, 1 S. D. 94, 45 N. W. 208, 8 L. R. A. 562, the court said:

"We are unable to perceive, on any principle of reason or justice, why a wife who agrees to separate from her husband should be more

favored by the law than one who clings to him in spite of his ill usage until, aged in years, infirm in body, and broken in spirit, she is finally driven from her home by his unbearable misconduct. It is no adequate response to say that the law makes the husband liable for necessaries which may be furnished the discarded wife under such circumstances. What if no tradesman would furnish such supplies, and take the risk of collecting against her husband? It would be extremely improbable that any wife could long maintain herself in that way. Such a support would be too uncertain, precarious, and humiliating. It neither meets the rights of the wife, nor the duties of the husband. It is equally unfair, unjust, and inequitable to tell the destitute, and possibly unoffending, wife, that the law will compel her husband to provide for her, if she will couple her application for maintenance with a complaint for divorce. There may be abundant reasons, controlling with her, and which the law ought to respect, why she does not want a divorce. There may be objections in conscience—a vital and unyielding principle and rule of her religion. She may unselfishly desire to avoid a public notoriety and scandal that would involve her children, or she may still have such affection for, and faith in, her husband as will feed the hope of his reformation and their reconciliation—reasons, all of them, which the law ought not to ignore or disrespect. The husband owing this duty of maintenance to the wife, we perceive no good reason why she may not, independent of any other ground, maintain an action against him for its enforcement."

In Kimble v. Kimble, 17 Wash. 75, 49 Pac. 216, the court said:

"If it is true that equity provides a remedy for all wrongs, a court of equity ought not to make the announcement that it would compel an abandoned wife, who is without fault, to seek a divorce from her husband before she can enforce the performance of a duty which the law imposes upon her husband, and obtain a right which the law guarantees to her, viz., the right to live. Nor do we think the best interests of society would be subserved by such a construction. It would encourage applications for divorce and necessarily increase them. Again, it would be a lever in the hands of husbands who abandon their wives without cause—who desire to be released from the bonds of matrimony, but are unable to procure a decree—to compel their wives to seek a divorce, the benefits of which would accrue to them. In addition to this, there is a question of conscience involved. Many women will be found who are conscientiously opposed to divorces. The members of religious societies, which embrace great numbers of our citizens, are opposed on religious and conscientious principles to divorces. And when we enter the domain of the affections, strange as it may seem, we find that affection frequently survives neglect, brutal treatment, and abandonment. In such a case, the wife does not desire a divorce from her husband. That is the one thing she shrinks from. She believes that the

alienation of the affections of her husband is temporary, and hopes in time to win him back to a resumption of the marriage relations. But in the meantime she must live."

Whatever may once have been the weight of authority, it is gratifying to know that the current of legal opinion on this subject of separate maintenance has undergone a change, so that now it may be said fairly that the tide has turned the other way.

The latest decision found by the court on this subject is that of Lang v. Lang, 70 W. Va. 205, 73 S. E. 716, 38 L. R. A. (N. S.) 950, Ann. Cas. 1913D, 1129 (W. Va., January 23, 1912), where the court, in the course of its opinion, says:

"We hold that equity has jurisdiction to decree alimony or maintenance to a wife, independently of our divorce statutes. Out of the great contrariety of opinion on the point, we choose that which seems best to accord with reason and justice. Indeed, we adopt the view which is now recognized by the current of authority in the United States, whatever may be said in some of the older encyclopedias and text-books. An extended critical examination of the subject convinces us that the courts of this country have so rapidly accepted the view which we now approve that the weight of authority is in its favor, though only a few years ago the writers generally announced that the weight was the other way. * * * That the reasons for such recognition are sound, is made clear by a reading of the authorities. 2 Nelson, Div. & Sep. §§ 1000–1003; 2 Story, Eq. Jur. § 1423a. Some of the older cases are Glover v. Glover, 16 Ala. 440; Galland v. Galland, 38 Cal. 265; Butler v. Butler, 4 Litt. (Ky.) 202; Garland v. Garland, 50 Miss. 694; Earle v. Earle, 27 Neb. 277, 43 N. W. 118, 20 Am. St. Rep. 667. The doctrine finds favor in new jurisdictions, by interesting opinions in the following: Bueter v. Bueter, 1 S. D. 94, 45 N. W. 208, 8 L. R. A. 562; Bauer v. Bauer, 2 N. D. 108, 49 N. W. 418; Kimble v. Kimble, 17 Wash. 75, 49 Pac. 216; Edgerton v. Edgerton, 12 Mont. 122, 29 Pac. 966, 16 L. R. A. 94, 33 Am. St. Rep. 557; Dole v. Gear, 14 Haw. 554. For collections of the cases generally, see 3 Enc. L. & P. 66; 2 Am. & Eng. Enc. Law, 94; 14 Cyc. 744."

See, also, extensive review of authorities in 38 L. R. A. (N. S.) 954.

My conclusion is that reason and authority uphold the jurisdiction. It is contended that, in any event, the court would not have power to allot an attorney's fee for the wife in prosecuting a suit for separate maintenance; but this contention cannot be sustained. "It would be but mockery to allow the

wife to maintain an action for separate maintenance and at the same time deny her the means of prosecuting it." Finn v. Finn, 62 Iowa, 482, 17 N. W. 739.