## EDGERTON, APPELLANT, v. EDGERTON, RESPONDENT.

[Submitted November 18, 1891. Decided May 2, 1892.]

MARRIAGE AND DIVORCE — *Maintenance* — *Equity jurisdiction of District Courts.* — Maintenance of a wife may be enforced by the District Courts of this State, in the exercise of their equity jurisdiction, by decreeing proper relief in an action brought by the wife against her husband, independently of an action for divorce, where it is shown that he without just cause has abandoned her, or by his cruelty or other improper conduct has given her cause for living separate and apart from him, and she is without means of support and he is able to maintain her.

JUDGMENTS — *Jurisdiction* — *Collateral attack.* — A judgment of a State court of general jurisdiction, valid upon its face, cannot be collaterally attacked in courts of the same State by showing facts *aliunde* the record, although such facts might be sufficient to impeach the judgment if brought to bear upon it in a direct attack; and therefore, a decree of divorce, obtained by a husband against his wife, which bears no infirmity upon its face, cannot be collaterally assailed, in an action brought by the wife to enforce maintenance, by the averment of facts showing the decree to be void for want of jurisdiction.

*Appeal from First Judicial District, Lewis and Clarke County.*

Action by wife for recovery of maintenance. Defendant's demurrer to the complaint was sustained by HUNT, J.

*A. C. Botkin* and *E. P. Cadwell,* for Appellant.

There are two main propositions to be considered : *First.* Are the parties hereto husband and wife? And to determine this we have only to consider the decree secured at Billings. Is it void or voidable? If void, we will then claim that the plaintiff is the wife of the defendant, and is entitled to maintain this action. If voidable, then we concede that we are premature in our action. *Second.* If we are right in our first premises, that the said decree under the allegations made in the complaint and admitted by the demurrer to be true, is void, then we are met with the second proposition : Can the plaintiff, independent of a statute and of an action for divorce, maintain an action for an allowance on the facts alleged in the complaint for the support of herself and their minor child? Reverting to our first proposition, which we deem it advisable to first consider, are plaintiff and defendant divorced? We claim not, and submit that, wherever want of jurisdiction over the person of the defendant is shown, that the judgment rendered without said jurisdiction is absolutely void, and is a nullity. We submit

further that this want of jurisdiction may as well be shown by evidence *aliunde* the record as from the face of the record; that in either case, if this want of jurisdiction is shown, the decree is absolutely void; it has no force or effect. By it no rights are divested, and from it no rights can be obtained; being worthless in itself, all proceedings founded upon it are worthless; it neither bars nor binds any one by any acts performed under it. It is not for the fraud which was practiced by the plaintiff upon the court to induce it to enter this pretense of a judgment, that we ask to have it set aside; but it is upon the ground that the court had no jurisdiction over the person of the defendant, no process having been served upon her, and no authorized appearance having been made. We submit that the authorities hold that a judgment rendered by a court having no jurisdiction over the person of the defendant is void, and equally so whether this want of jurisdiction appears upon the face of the record or appears from evidence outside of the record. (*Starbuck* v. *Murray,* 5 Wend. 157; 21 Am. Dec. 172; *Thompson* v. *Whitman,* 18 Wall. 457; *Webster* v. *Reed,* 11 How. 437; *Harris* v. *Hardeman,* 14 How. 334; *Christmas* v. *Russell,* 5 Wall. 290; *United States* v. *Arredondo,* 6 Peters, 691; *Shriver* v. *Llyn,* 2 How. 59, 60; *Hickey* v. *Stewart,* 3 How. 762; *Williamson* v. *Berry,* 8 How. 540; *Shelton* v. *Tiffin,* 6 How. 183; *Elliott* v. *Lessee of Piersol,* 1 Peters, 328; Bishop on Marriage and Divorce, §§ 418, 419; *Caswell* v. *Caswell,* 120 Ill. 377; *Greene* v. *Greene,* 2 Gray, 361; 61 Am. Dec. 454; *Edson* v. *Edson,* 108 Mass. 590; 11 Am. Rep. 393; Freeman on Judgments, §§ 98, 99, 117, 118, 499, 509; Kerr on Fraud and Mistake, p. 51; *Feikert* v. *Wilson,* 38 Minn. 341; *Holyoke* v. *Haskins,* 5 Pick. 20; 16 Am. Dec. 372; *Attorney General* v. *Purmort,* 5 Paige, 631; *Gest* v. *Packwood,* 39 Fed. Rep. 535; *Earle* v. *Earle,* 27 Neb. 277; 20 Am. St. Rep. 667; *Bradshaw* v. *Heath,* 13 Wend. 416, 417.) Now we come to the second question of vital importance. Can the wife maintain an action against her husband for support, call it maintenance or alimony as you please, under the facts stated in the complaint? We submit the rule to be that, in any case where it is allowed, the same state of facts must exist as would have to exist to enable the wife to procure a decree of divorce; we charge cruelty and

abandonment, either of which would be sufficient to procure a decree of divorce. If there is a sufficient statement to entitle the plaintiff to procure a divorce, if one was asked herein, then she is entitled to recover from the defendant her support independent of a decree of divorce, and of statute giving her that right. (*Galland* v. *Galland*, 38 Cal. 269; *Wilson* v. *Wilson*, 45 Cal. 399; *Daniels* v. *Daniels*, 9 Colo. 133; *Earl* v. *Earl*, 27 Neb. 277; 20 Am. St. Rep. 667; *Platner* v. *Platner*, 66 Iowa, 378; *Glover* v. *Glover*, 16 Ala. 446; *Purcell* v. *Purcell*, 4 Hen. & M. 507–511; *Almond* v. *Almomd*, 4 Rand. 662; 15 Am. Dec. 781; *Wallingsford* v. *Wallingsford*, 6 Har. & J. 485; *Crane* v. *Meginnis*, 1 Gill & J. 463; 19 Am. Dec. 237; *Helms* v. *Franciscus*, 2 Bland Ch. 544; 20 Am. Dec. 402; *Verner* v. *Verner*, 62 Miss. 263, and causes cited; *Butler* v. *Butler*, 4 Litt. 201; *Lockridge* v. *Lockridge*, 3 Dana, 28; 28 Am. Dec. 52; *Walker* v. *Stringfellow*, 30 Tex. 570; *Rhame* v. *Rhame*, 1 McCord Ch. 197–205; 16 Am. Dec. 597; *Hair* v. *Hair*, 10 Rich. Eq. 163; *Prather* v. *Prather*, 4 Desaus. Eq. 33–43; *Bascom* v. *Bascom*, Wright, 632; *Questel* v. *Questel*, Wright, 491; *Spiller* v. *Spiller*, 1 Hayw. [N. C.] 482; *Knight* v. *Knight*, 2 Hayw. [N. C.] 101; *Bueter* v. *Bueter*, 45 N. W. Rep. 208, S. Dak. April 1, 1890; *Spengler* v. *Spengler*, 38 Mo. App. 266; *Lindenschmidt* v. *Lindenschmidt*, 29 Mo. App. 295.) The United States Supreme Court has incidentally referred to and recognized the doctrine in *Barber* v. *Barber*, 21 How. 582; *Cheever* v. *Wilson*, 9 Wall. 108. All of these courts have so held independent of an action for a divorce, and without a State statute authorizing the action. Then the following States have authorized the action by statute: Illinois, New Jersey, Michigan, Indiana, Tennessee, and Kansas. And when we remember that State statutes are properly and usually the crystalization of public or judicial sentiment, recognizing the need of the statute, and simplifying the remedy, the statutes in these States are arguments in our favor; especially is this so when some of the States we have cited cases in are the same as those where the courts held, independent of statute, they had the right to entertain suits for maintenance, and in these same States, statutes have been enacted allowing such to be maintained, as in California, Maryland, North Carolina; thus, instead of enacting a

new law, or creating a new right, the statute simply recognized
a right then existing and simplified its enforcement. It was
urged by defendant in the court below, that our courts in the
exercise of their equity functions, had no power to grant relief
in cases of this kind, in the absence of legislative authority;
that by the provisions of our statute, the granting of alimony
is but an incident to a divorce proceeding. We submit that
while the statute gives the court power to award alimony, at
the time a decree of divorce is rendered, that this does not
deprive a court of equity from granting alimony independent
of statute, and of an action for a divorce. The statute is not
exclusive; it does not deprive a court of equity from exercising
its equity function. Can it be claimed that courts of equity
have no power to remedy a wrong and grant relief to an injured
wife, independent of a statute giving it the power so to do?
Can it be that property rights may be divested and a wife de-
prived of her property rights, and no relief can be granted by
the courts because of no special act of legislature conferring
upon them the power? (Pomeroy's Equity Jurisprudence,
§§ 60, 67.) It is true that in England Parliament concurrently
with the ecclesiastical courts, granted divorces *a mensa et thoro*,
and that Parliament retained the exclusive power to grant
divorces, *a vinculo matrimonii*, until this power was granted to
"the court for divorces and matrimonial causes." It is also
true that in our States the legislatures exercised the right to
grant divorces until it was vested, by legislative enactment, in
the courts in every State except South Carolina. And in nearly
all cases, as incident to the power to grant divorces was the
power to adjudicate upon the property rights of the parties.
But while the Parliament and legislatures severed the marriage
relation, they did it regarding the relation as a status, and hav-
ing in mind the good of society, arrogated to itself these powers.
Still, at no time, did it so legislate regarding the act as a judicial
function. When property rights were to be affected, when
property was to be taken from one and given to another, then
the parties were rightfully relegated to the judicial branch of
our government. The granting of alimony, of maintenance,
of support of minor children, of adjudication upon the property
rights of husband and wife, has always been a matter for the

courts to act upon. It existed by virtue of the contractual relation of the parties, and the marital relation having been entered into by virtue of a contract, it was but fit, proper, and right that the rights growing out of this contract should be recognized and enforced in a court of competent jurisdiction.

*McConnell & Clayberg,* and *Thos. C. Bach,* for Respondent.

I. Did the District Court of Lewis and Clarke County have jurisdiction to determine an independent suit for the recovery of maintenance? The action is in equity, and in order to determine the question of jurisdiction in this case it is important to consider what jurisdiction may be exercised by courts of equity in this State. Our Constitution lodges equity jurisdiction in the District Court in the following terms: "The District Court shall have original jurisdiction in all cases at law and in equity, etc." (Art. viii. § 11, Const.) It is, we believe, the settled rule that under such provision courts of equity can only exercise such jurisdiction as was exercised by the English court of chancery at the date of the Revolution. (1 Pomeroy's Equity Jurisprudence, ¶¶ 282, 285, 294, et seq.; *Fontain* v. *Ravenal,* 17 How. 369; *Jones* v. *Boston Mill Corp.* 4 Pick. 507; 16 Am. Dec. 358. See, also, cases *infra.*) While there seems to be some diversity among the opinions of different courts as to what the English cases have decided, we believe that but two or three instances have been reported wherein the English court of chancery took cognizance of any proceeding relative to alimony or maintenance, except during the existence of the commonwealth. During this time, special commissions seem to have been issued giving such authority, because the ecclesiastical courts during that period were abolished. (*Ball* v. *Montgomery,* 2 Ves. 195; *Stones* v. *Cooke,* 2 Sim. 22; *Vandergucht* v. *De Blaquisere,* 8 Sim. 315.) It is a part of the history of the law, too well known to need citation of authority, that in England the courts of chancery never exercised jurisdiction over questions of divorce or their incidents. Whenever judicial action was invoked, it was always exercised through ecclesiastical courts; and these courts never allowed any separate action either for alimony or maintenance. It was always inci-

dent to some other proceeding, such as divorce or a suit to restore marital rights. Ecclesiastical courts have always been foreign to our institutions, and the jurisdiction exercised by such courts in England has never descended directly to any of our courts. Wherever any of its jurisdiction has been exercised in this country, it has been conferred by positive enactment through the people or their representative. We believe that the following rule is fully established and maintained by the authorities, to wit: That unless the jurisdiction is provided for by positive statutory enactment or by constitutional provision, courts of equity in this country possess no jurisdiction to hear or determine suits brought solely for the recovery of alimony or maintenance. (*Lawson* v. *Shotwell*, 27 Miss. 630; *Bankston* v. *Bankston*, 27 Miss. 692; *Bowman* v. *Worthington*, 24 Ark. 529; *McGee* v. *McGee*, 10 Ga. 477; *Goss* v. *Goss*, 29 Ga. 109; *Fischli* v. *Fischli*, 1 Blackf. 360; 12 Am. Dec. 251; *Muckenburg* v. *Holler*, 29 Ind. 139; 92 Am. Dec. 345; *Moon* v. *Baum*, 58 Ind. 194; *Chestnut* v. *Chestnut*, 77 Ill. 346; *Trotter* v. *Trotter*, 77 Ill. 511; *Ross* v. *Ross*, 69 Ill. 569; *Harshberger* v. *Harshberger*, 26 Iowa, 503; *Wilson* v. *Wilson*, 49 Iowa, 544; *McFarland* v. *McFarland*, 51 Iowa, 565; *Jones* v. *Jones*, 18 Me. 311; 36 Am. Dec. 723; *Henderson* v. *Henderson*, 64 Me. 419; *Littlefield* v. *Paul*, 69 Me. 533; *Shannon* v. *Shannon*, 2 Gray, 287; *Baldwin* v. *Baldwin*, 6 Gray, 342; *Coffin* v. *Dunham*, 8 Cush. 405; 54 Am. Dec. 769; *Adams* v. *Adams*, 100 Mass. 365; 1 Am. Rep. 111; *Peltier* v. *Peltier*, Har. Ch. (Mich.) 19; *Perkins* v. *Perkins*, 16 Mich. 167; *Doyle* v. *Doyle*, 26 Mo. 545; *Simpson* v. *Simpson*, 31 Mo. 24; *Parsons* v. *Parsons*, 9 N. H. 317; *Sheafe* v. *Sheafe*, 24 N. H. 569; *Kirrigan* v. *Kirrigan*, 15 N. J. Eq. 146; *Nichols* v. *Nichols*, 25 N. J. Eq. 60; *Yule* v. *Yule*, 10 N. J. Eq. 138; *Rockwell* v. *Morgan*, 13 N. J. Eq. 119; *Anshutz* v. *Anshutz*, 16 N. J. Eq. 162; *Cory* v. *Cory*, 11 N. J. Eq. 400; *Atwater* v. *Atwater*, 53 Barb. 621; *Ramsden* v. *Ramsden*, 91 N. Y. 281; *Codd* v. *Codd*, 2 Johns. Ch. 141; *Lewis* v. *Lewis*, 3 Johns. Ch. 519; *Mix* v. *Mix*, 1 Johns. Ch. 108; *Perry* v. *Perry*, 2 Paige, 501; *Harrington* v. *Harrington*, 10 Vt. 505; *Prosser* v. *Warner*, 47 Vt. 667; 19 Am. Rep. 132; *Barker* v. *Dayton*, 28 Wis. 367; *Wilson* v. *Wilson*, 2 Dev. & B. 377; 1 Bishop on Marriage and Divorce, §§ 1383–1421.)

How it can be maintained that a court of equity can exercise as "an inherent power" a jurisdiction which never existed in or was exercised by courts of equity in England, is beyond our comprehension, unless such jurisdiction is specifically conferred by the Constitution or by the statute. The jurisdiction not being given by the Constitution, was it given by the statutes? Section 1004 of our statutes grants all the statutory jurisdiction with reference to alimony and maintenance, and it will be perceived from an examination of that section that the jurisdiction of the court to grant alimony or maintenance is always to be exercised in connection with a proceeding for divorce. But again, many of the courts, in deciding the causes cited by appellants, hold that, inasmuch as the ecclesiastical courts only granted maintenance as an incident to a divorce, these courts would only grant maintenance when the cases made would have entitled the party to a divorce under the rulings of the English ecclesiastical courts. For instance, under the rulings of the ecclesiastical courts no cruelty was sufficient to warrant a divorce or maintenance unless it was the result of personal and physical violence; therefore, the courts holding the above doctrine, would not grant maintenance in a separate proceeding, unless the complaint contained allegations showing that the party would have been entitled to a divorce under the ecclesiastical rulings with reference to extreme cruelty. (*Helms* v. *Franciscus*, 2 Bland Ch. 544; 20 Am. Dec. 402.) It will be noticed that in all the cases cited by appellant, the relation of husband and wife existed, and the jurisdiction to grant maintenance in a separate suit is based upon this relationship, because if the relationship has ceased, then the obligation upon which the jurisdiction is based has ceased. The obligation having ceased, there are no rights to be enforced or wrongs to be remedied.

II. If such jurisdiction existed could it be exercised in this case? Unless this decree is absolutely void, it severed and destroyed the marriage relation, and under the appellant's cases, above referred to, the court had no jurisdiction. If the decree is absolutely void, then it is as if it had not been, and the marriage relation still exists. If not void, but merely voidable, it is good until it is set aside. If voidable only, its validity

cannot be attacked collaterally as is sought herein. As to the distinction between a void and voidable judgment, see Freeman on Judgments [2d ed.], section 116; 1 Black on Judgments, section 170. As to the distinction between direct and collateral attacks, see 1 Black on Judgments, section 170. A judgment of a State court of general jurisdiction can only be attacked collaterally in the courts of the same State where it bears its own infirmity upon its face. (*Cook* v. *Darling*, 18 Pick. 393; *Granger* v. *Clark*, 22 Me. 128; *Coit* v. *Haven*, 30 Conn. 190; 79 Am. Dec. 244; *Wingate* v. *Haywood*, 40 N. H. 437; *Penobscot R. R. Co.* v. *Weeks*, 52 Me. 456; *Clark* v. *Bryan*, 16 Md. 171; *Callen* v. *Ellison*, 13 Ohio St. 446; 82 Am. Dec. 448; *Horner* v. *Doe*, 1 Ind. 131; 48 Am. Dec. 355; *Prince* v. *Griffin*, 16 Iowa, 552; *Hahn* v. *Kelly*, 34 Cal. 391; 94 Am. Dec. 742; *Ex parte Ah Men*, 77 Cal. 198; 11 Am. St. Rep. 263; *Galpin* v. *Page*, 1 Sawy. 317; *Hunter* v. *Ferguson*, 13 Kan. 471; *Blasdel* v. *Kean*, 8 Nev. 305; Black on Judgments, §§ 271, 272, 273; *Gilman* v. *Gilman*, 126 Mass. 26; 30 Am. Rep. 646; *Lee* v. *Kingsbury*, 13 Tex. 68; *Brown* v. *Nichols*, 42 N. Y. 26; *Sperry* v. *Reynolds*, 65 N. Y. 179.) These cases also hold that every presumption is in favor of such judgment, whether it recites jurisdiction or whether it is silent. Many cases have been cited wherein the particular reasons herein relied upon were urged as reasons that the judgment was void and could be collaterally attacked, but the weight of authority is against such proposition. (Freeman on Judgments, § 128; 1 Black on Judgments, § 272; *Newcomb* v. *Peck*, 17 Vt. 302; *Baker* v. *Stonebraker*, 34 Mo. 172; *Carpentier* v. *City of Oakland*, 30 Cal. 440; *Harshey* v. *Blackmarr*, 20 Iowa, 161; 89 Am. Dec. 520; *American Ins. Co.* v. *Oakley*, 9 Paige, 496; 38 Am. Dec. 561; *Reed* v. *Pratt*, 2 Hill, 64; *Brown* v. *Nichols*, 42 N. Y. 26; *Rogers* v. *Burns*, 27 Pa. St. 525; *Bunton* v. *Lyford*, 37 N. H. 512; 75 Am. Dec. 144.) It is the law that judgments of one State are always open to a collateral attack in another State for want of jurisdiction. (*Christmas* v. *Russell*, 5 Wall. 290; *Thompson* v. *Whitman*, 18 Wall. 457; *Gilman* v. *Gilman*, 126 Mass. 26; 30 Am. Rep. 646.) It is also held that judgments of State courts may be collaterally attacked in the federal courts held in the same State in which the judgment was rendered. The

nation and State are distinct sovereigns, so that the judgment of the State court is a foreign judgment. (*Galpin* v. *Page*, 3 Sawy. 93; note to *Hahn* v. *Kelly*, 94 Am. Dec. 766; *Swift* v. *Meyers*, 37 Fed. Rep. 37.)

HARWOOD, J.—There are two questions brought here for determination by this appeal. The first relates to the jurisdiction, in equity, of the District Courts of this State, and may be stated by the following proposition: Have the District Courts of this State power, in the exercise of their equity jurisdiction, to enforce maintenance of a wife by decreeing proper relief in an action brought by her against her husband, independently of an action for divorce, where it is shown that he, without just cause, has abandoned her, or by his cruelty or other improper conduct has given her just cause for living separate and apart from him, and she is without means of support, and he is able to maintain her?

An action of this character, if maintainable at all, would naturally lie within the equitable jurisdiction of the District Court. The subjects of equity, as well as common-law jurisdiction, are so well defined there can seldom arise a dispute as to whether a particular action for the enforcement of rights or the redress of wrongs lies within the cognizance of one or the other, or whether such action is not within either of these jurisdictions. In relation to the question just propounded, however, there have been and still are differences of opinion in the courts and among able jurists; and the discussion of it has sounded the depths and surveyed the scope and circumference of the equity jurisdiction of courts where it has been brought in question.

It is unnecessary to recite the facts involved in the case at bar in order to treat this proposition. It may be treated as a question of law, relating to the equity jurisdiction of the court, without reference to any particular action.

That the marriage relation lays upon the husband an obligation to furnish his wife necessary and comfortable maintenance, commensurate with his ability to provide, is a proposition upon which there is no dispute. It is an obligation imposed by law as one of the conditions of the marriage contract, and is recognized by all courts of justice, and is enforced, in proper

cases, where the jurisdiction lies.  Courts of common-law juris-
diction (as distinguished from equity courts) enforce that obli-
gation by giving judgment against the husband for necessary
supplies furnished the wife by third persons, where the husband,
without just cause, withholds the same, or abandons his wife,
or by cruelty or otherwise makes it unsafe or improper for her
to abide at the family home.

In this way it will be seen that even courts of common-law
jurisdiction not only recognize, but to some extent enforce,
performance of that obligation.  The jurisdiction exercised by
the common-law courts was usually explained on the theory
that the law presumed the wife to be the agent of the husband
to the extent of authority to obtain upon his credit necessary
personal supplies.  But it is plainly observable by an investi-
gation of these cases that the common-law courts proceed upon
a different ground than the mere relation of principal and agent;
for when the husband had abandoned his wife, or driven her
away by cruelty or other improper conduct, and had sought to
avoid responsibility of her maintenance by giving notice for-
bidding parties to furnish her supplies, and attempting to re-
voke her authority in that respect, still the common-law courts,
notwithstanding such notice, held him bound for her necessary
supplies, by an obligation irrevocable at will, arising by virtue
of the marriage relation, and gave judgment against him.
(Schouler on Domestic Relations, § 66; *Sykes* v. *Halstead*, 1
Sandf. 483; 1 Bishop on Marriage and Divorce, 572, and cases
cited.)   It will be observed in these cases, too, that, where the
wife was living separate and apart from her husband, it was
always a proper inquiry whether she had just cause for so doing;
and, if she had not, that was a good defense.  It seems to be
clear, then, that the common-law courts proceeded in such cases
upon a different principle than the law of agency alone, and
founded their judgments on the obligation of the husband to
support his wife, even separate and apart from his habitation,
where by his conduct he had justified her separation, or where
he had, without cause, forsaken her — an obligation which he
could not terminate at will, as may be done in case of principal
and agent.   (2 Kent Com. 146; Schouler on Domestic Rela-
tions, § 66; 1 Bishop on Marriage and Divorce, §§ 550–572,

and cases cited; *Liddlow* v. *Wilmot*, 2 Stark. 86; *Casteel* v. *Casteel*, 8 Blackf. 240; 44 Am. Dec. 763; *Clement* v. *Mattison*, 3 Rich. 93; *Hall* v. *Weir*, 1 Allen, 261; *Cartwright* v. *Bate*, 1 Allen, 514; 79 Am. Dec. 759; *Cunningham* v. *Irwin*, 7 Serg. & R. 247; 10 Am. Dec. 458; *Rumney* v. *Keyes*, 7 N. H. 571; *Allen* v. *Aldrich*, 29 N. H. 63; *McGahay* v. *Williams*, 12 Johns. 293; *Mayhew* v. *Thayer*, 8 Gray, 172; *Walker* v. *Simpson*, 7 Watts & S. 83; 42 Am. Dec. 216; *Schnuckle* v. *Bierman*, 89 Ill. 454; *Reese* v. *Chilton*, 26 Mo. 598; *Rutherford* v. *Coxe*, 12 Mo. 347; *Brienig* v. *Meitzler*, 23 Pa. St. 156; *Billing* v. *Pilcher*, 7 Mon. B. 458; 44 Am. Dec. 523; *Snover* v. *Blair*, 25 N. J. L. 94; *Blowers* v. *Sturtevant*, 4 Denio, 46.)

Although the common-law courts will give judgment against the husband in such cases, it must be admitted by all to be an uncertain and inadequate relief; for in many cases she may be unable to obtain credit under such circumstances, where she can only offer the chance of compelling payment by suit against a husband who is endeavoring to escape such liability. Her position is also embarrassed by the reluctance of parties generally to becoming directly or indirectly implicated in family troubles, or to undertake to show justification for the conduct of the wife, which operates as a powerful influence in deterring persons from giving her credit. The relief offered by the common-law courts is inadequate for still other reasons. While it may succeed for a brief period in some cases, the derelict husband is left free to carry out his purpose, to abandon and neglect the support of his wife, and avoid such judgments altogether by disposing of his property, or by carrying it beyond the jurisdiction. In this way he not only ignores his obligation, but sets at naught the attempt of the common-law courts to compel its performance. There are other aspects of this method of granting relief which ought not be passed without observation. If that remedy happens to be effectual in some cases, because the husband fails to use the means within his power to escape the liability, that method of enforcing maintenance would involve a multiplicity of lawsuits; for the wife must usually go to various parties to secure supplies, whereby would arise a separate cause of action in favor of each party from whom supplies were obtained; and, as often as one collection was made,

another cause of action would begin to accrue. Again, the inadequacy of relief worked out by the common-law remedy is not alone relative to the position of the wife. It has its counterpart of hardship in reference to the husband. In case the husband has just grounds for his conduct, and desires to establish the same, he would have to present his defense in as many actions at law as happened to be brought against him for supplies furnished the wife; for having established his defense in one or more actions would not preclude the annoyance, loss of time, and expense of defending other actions of the same character. So the question naturally arises whether or not, upon principle, these cases lie within the jurisdiction of courts of equity, and the conditions just pointed out suggest two familiar principles of equity as grounds upon which courts exercising that jurisdiction take cognizance of actions, and determine the rights of parties, namely: (1) Inadequacy of the relief which can be obtained in the courts of law; (2) that to obtain relief in courts of common-law jurisdiction would involve a multiplicity of suits. Mr. Pomeroy, upon this head, observes: "In fact, the multiplicity of suits, which is to be prevented, *constitutes the very inadequacy of legal methods and remedies* which calls the concurrent jurisdiction into being under such circumstances, and authorizes it to adjudicate upon purely legal rights, and confer purely legal reliefs. On the other hand, the prevention of multiplicity of suits is the *occasion* for the exercise of the exclusive jurisdiction." (Pomeroy's Equity Jurisprudence, § 243.)

This class of actions was not generally entertained by the English chancery court for the obvious reason that in England the ecclesiastical tribunal existed, to which, as was conceded by all, such adjudications peculiarly belonged. There was therefore no reason in general for the chancery court in England to concern itself with actions seeking such relief. (Fonb. Eq. [4th Am. ed.] 98, note 105.) But it nevertheless seems plain that had not another court existed in the judicial system of England, which had jurisdiction of this class of cases, there is every analogy which would have brought those cases within the jurisdiction of the court of chancery. This court took cognizance of other cases concerning marital rights. It enforced against the husband ante-nuptial contracts and settle-

ments made on behalf of his intended wife; compelled settlements to be made on behalf of the wife, where he was seeking to obtain possession or control of her property; withheld her separate property from his grasp, and devoted it to her maintenance, where he had so conducted himself as to justify her living in separation from him; enforced agreements by the spouses as to property rights, and maintenance made in contemplation of separation; by the writ of *ne exeat*, "restrained the husband from quitting the kingdom to evade the payment of an agreed or decreed allowance"; used its power to enforce decrees of the spiritual court, awarding separate maintenance to the wife; and, by process known as the "writ of *supplicavit*," the chancery court protected the wife against the husband's violence, and in cases where it was found unsafe for her to abide with him, as incident to such proceedings, compelled the husband to provide maintenance for her while she was separate and apart from him, by reason of his violent conduct towards her.   This proceeding, however, appears to have become obsolete, probably because statutes provided a remedy for protection of all persons from threatened violence.   No doubt, other instances could be pointed out wherein the English chancery court exercised jurisdiction in reference to the marital rights and obligations. (Fonb. Eq. 90–106, and notes; 2 Spence's Equitable Jurisdiction, 489, 526; 2 Story on Equity Jurisprudence, §§ 1423, 1476; 3 Pomeroy's Equity Jurisprudence, §§ 1114–1120; 2 Bishop on Marriage and Divorce, § 352.) It is also clear that within the principals, procedure, and practice applied by courts of equity there are ample and appropriate methods to adequately enforce in one action the right of the wife to support against a husband who without cause abandons her, and at the same time, in the same action, vouchsafe to the husband any defense he may have to offer in justification of his conduct.

It is proper at the outset of this investigation to inquire whether, by statute, any provision has been made in relation to the right in question, and the remedy to be applied in case of its non-fulfillment.   Our statute provides that the District Court, "sitting as a court of chancery," may, for certain causes specified, decree a "dissolution of the bonds of matrimony";

and that "when a divorce shall be decreed, it shall and may be lawful for the court to make such order touching the alimony and maintenance of the wife, the care and custody of the children, or any of them, as from the circumstances of the parties and nature of the case shall be fit, reasonable, and just; and, in case the wife be complainant, to order the defendant to give reasonable security for such alimony and maintenance, or may refuse the payment of such alimony and maintenance in any other manner consistent with the rules and practice of the court, and may also grant alimony '*a pendente lite*'; and the court may, on application, from time to time, make such alterations in the allowances of alimony and maintenance as shall appear reasonable and just." (§§ 1000, 1004, 1006, div. 5, Comp. Stats.)

It is contended that these provisions of the statute as to the decree for alimony and maintenance "when divorce is granted," by implication, exclude from the courts the jurisdiction to enforce the maintenance, except in an action where divorce is decreed. Some have so held, but upon this phase of the question, as upon nearly all aspects of it, eminent authorities are opposed to one another in the views entertained. Our own conclusion upon this particular feature of the question is that the great weight of reason is against the idea that the legislature, in adopting the statute referred to, intended any regulation of the right of the wife to maintenance, or the obligation of the husband to furnish the same, arising and existing by virtue of the marriage bond prior to, and in no manner dependent upon, the dissolution of that bond by decree of court, or that by such statute the legislature intended to take away, or in any manner control whatever jurisdiction the courts may have had to enforce the fulfillment of that obligation in an action independent of a proceeding for divorce. In construing or applying a statute the cardinal rule, always applicable, is to seek the intention of the legislature. The simple question then is, did the legislature, in providing for the granting of divorces on certain prescribed grounds, and providing that, when divorce was decreed, alimony and maintenance might also be decreed, intend to have it inferred or implied therefrom that the obligation of the husband to maintain his wife should not be enforced, unless the

bonds of matrimony were first dissolved? Or was it only the intention of the legislature, as manifest in such statute, to make sure, by the provisions authorizing the decree for alimony and maintenance of the wife after dissolution of the bonds of matrimony, to fasten upon the husband the continued obligation to support his wife, even though the bonds of matrimony had been dissolved because of his wrongful conduct? After divorce the obligation to maintain the wife, which arose by virtue of the marriage contract, could not be referred to that relation, because of its non-existence; and there might be grave reason to doubt whether a court was authorized to continue to enforce that obligation after dissolution of the bond by which it arose, without a statutory provision to that effect. It is manifest by said statute that the legislature intended that the offending husband should not escape the obligation he had entered into, to support his wife while she kept faith with her marriage vows and duties, even though he succeeded by his wrongful conduct in driving her to obtain a divorce. If this provision implied that the obligation could only be enforced by first dissolving the bonds of matrimony, the law would be open to the charge that it was so framed as to encourage divorces; for the wife who kept faith with the marriage vows might be driven by privation, in some cases at least, to release the husband from the bonds of matrimony by applying for a divorce, in order to obtain relief from penury and want. Such a construction of the legislative intent would make the statute provide, in effect, that in case a wife was driven away or deserted, and left without means of support, if the husband remained in the State (and committed no more flagrant violations of the marriage bond), she must wait a year, and in the mean time suffer in destitution, or suffer the humiliation of becoming a public charge, or seek relief through friends or strangers, before she could call upon a court to grant her a divorce, and then compel the offending husband, out of his substance, to fulfill his obligation to support her; at which time the derelict husband may have placed himself and property beyond the reach of the court; at least, he would in such case be given ample opportunity to do so. It can hardly be presumed that the legislature, while carefully providing for the continuance of the obligation of the husband to maintain his

wife after divorce, intended by the statute to cut off any juris-
diction which might be in the courts to simply enforce the
obligation while the bonds of matrimony still existed. A more
reasonable conclusion, we think, is that the statute under con-
sideration manifests no such intention, but leaves the marital
rights and obligations before divorce to be dealt with by the
courts in whatever respect their jurisdiction might allow.

We therefore return to the main question, as to whether there
is in the equity courts of this State any jurisdiction to interfere
on behalf of a wife deserted and left destitute, without cause,
and compel the husband, if able, to support her. This subject
has led to a very close investigation by the American courts
(see cases cited in briefs of counsel) of the manner in which the
chancery court of England dealt with such cases. The juris-
diction exercised by that court upon kindred subjects has already
been adverted to. But upon this particular branch of adjudi-
cation, as is affirmed by some, the holding of the English chan-
cery court has not been harmonious; and, while this criticism
is probably correct, it must still be admitted that the doctrine
finally became settled, to the effect that cases where such relief
was sought would not be entertained in the chancery court, but
left to the spiritual court. This was, of course, the natural
result when we consider the judicial system prevailing at that
time in England. Even with these conditions, however, the
English chancery court did not seem to have construed its juris-
diction as so unyieldingly restricted in this matter that no relief
could be granted in that court. There is a notable case as late
as 1811, where Lord Eldon, one of the greatest and most con-
servative of English chancellors, ordered certain property in
probate devoted to the support of a deserted wife. It is not
clearly stated in the opinion or statement of the master that this
property belonged to the husband by descent, but that seems to
be the case from the context; for if the property had descended
to the wife in her own right, according to the course of equity,
there would have been no hesitation whatever in applying it to
her separate maintenance, where she was abandoned by her
husband. In ordering the property applied the lord chancellor
said: "I have a strong impression on my mind that this has
been done; and, independent of precedent, I think the court

may do it; as the husband deserting his wife leaves her credit for necessaries, and would be liable to an action, and, though execution could not be had against the stock, the effect might be obtained circuitously, as he could not relieve himself except by giving his consent to the application of this fund." (*Guy* v. *Pearkes*, 18 Bes. 196.)

In the American States the ecclesiastical court was not made a part of the judicial system. There being a court of chancery or equitable jurisdiction, however, and there being the conditions involved, whereby that court had grounds, upon principle, to take jurisdiction of such cases, it is not at all strange that some of the American courts of equity entertained them; and thus was established what Judge Story termed the broader jurisdiction asserted by the American courts in such cases. In his work on Equity Jurisprudence, he says: "In America, a broader jurisdiction in cases of alimony has been asserted in some of our courts of equity; and it has been held that if a husband abandons his wife, and separates himself from her without any reasonable support, a court of equity may in all cases decree her a suitable maintenance and support out of his estate, upon the very ground that there is no adequate or sufficient remedy at law in such a case. And there is so much good sense and reason in this doctrine that it might be wished it were generally adopted." (2 Story on Equity Jurisprudence, § 1423.)

It will be seen from these remarks that this eminent authority on equity jurisprudence saw clearly that these cases involved conditions which, upon fundamental principles of equity, would bring them into that jurisdiction, i. e., there was a *legal right* of the wife to maintenance, existing and deeply implanted in the law — a right capable of judicial enforcement — and that the common-law courts, although recognizing and attempting to enforce such right, by reason of their forms of procedure, fell far short of giving adequate relief. There was therefore the ground in principle for equitable relief.

Since Judge Story wrote, the doctrine of the American courts of equity, which he mentions, has steadily been gaining ground, until now it is held, without the aid of statute, in a large number of the States, as will be seen by reference to citations of appellant's brief. The latest case we have examined was

decided in the year 1890 by the Supreme Court of South
Dakota, wherein Kellam, J., in a very able opinion, held that
the case was within the equitable jurisdiction of the courts of
that State; and he did not base the conclusion upon any specific
constitutional or statutory provision or implication mentioned
in his opinion. (*Bueter* v. *Bueter*, 45 N. W. Rep. 208, S. Dak.
April 1, 1890.)

The Supreme Court of the United States, in 1858, had occa-
sion, in the case of *Barber* v. *Barber*, 21 How. 582, incidently
to review a number of cases in which the equity jurisdiction
was held to extend over this class of cases; and no expression
is found in the opinion, showing that the court regarded the
exercise of such jurisdiction as extraordinary, or in any manner
an arbitrary assumption of a jurisdiction not properly belonging
to courts of equity on principle.

Over against the holding which Judge Story mentions, there
are courts of eminent authority holding the contrary. (See
cases cited by counsel for respondent.) But the divergence of
views upon this subject held by the American courts may not
be without reasonable explanation, which would apply at least
to some States. While there is a general harmony in the
American courts of equity with one another, and with the
English court of chancery, in the practice, procedure, and
principles applied, and the precedents emanating from them
may be safely referred to as authority in cases lying within
their jurisdiction, still, when the question is as to the extent of
the equitable jurisdiction possessed by courts of one State, the
determination of courts of another as to the extent of their own
jurisdiction cannot, as a rule, be relied on as furnishing an
exact criterion for measuring the boundaries of the jurisdiction
in the former State, unless the statutory or constitutional pro-
visions governing the subject are substantially alike. This arises
from the great variation in the constitutional and statutory pro-
visions establishing and defining such jurisdiction in the different
States. Therefore, for example, to quote from Massachusetts,
as denying that the equitable jurisdiction of their courts extends
to cases like the one at bar, cannot be regarded strictly as au-
thority for denying that such jurisdiction belongs to equity
courts at all, nor that such jurisdiction may not pertain to the

equity courts of another State, because, although emanating from one of the ablest benches in the Union, the court is speaking of the extent of its own equity jurisdiction, which appears to be limited to certain heads, specifically defined by statute, and that jurisdiction does not appear to be as broad as that exercised by the English court of chancery, or that exercised by other States of the Union. (1 Pomeroy's Equity Jurisprudence, § 286; General Statutes of Massachusetts, 1860, p. 558; *Adams* v. *Adams,* 100 Mass. 365; 1 Am. Rep. 111.) There, also, the statute not only provided for absolute divorce, but for a decree of separation from bed and board, with separate maintenance out of the husband's estate. (General Statutes of Massachusetts, ch. 107, p. 531.)

These variations in the scope of the equitable jurisdiction granted to the federal courts, and that possessed by the courts of the various States, is fully explained by Mr. Pomeroy in his great work on Equity Jurisprudence. He says: "In some of the States, this statutory delegation of power is so broad and comprehensive that the jurisdiction which it creates is substantially identical with that possessed by the English court of chancery, except so far as specific subjects, like administration, have been expressly given to different tribunals; but in others the delegation of power is so special in its nature and limited in extent that a reference to the statutes themselves, on the part of the courts, as the source and measure of their jurisdiction, is a matter of constant practice and of absolute necessity. A correct knowledge of these statutory provisions in the various States is of the highest importance from another point of view. Without it the force and authority of decisions rendered in any particular State cannot be rightfully appreciated by the bench and bar of other commonwealths." (1 Pomeroy's Equity Jurisprudence, § 283.) In the same chapter the author brings to view the statutory and constitutional provisions under discussion. It is therefore not surprising, when these conditions are considered, to find different views held by different courts, when the question turns upon the extent of the equitable jurisdiction possessed.

Mr. Bishop, in his valuable work on the subject of Marriage and Divorce (vol. 2, § 356, 6th ed.), exerts the great weight of

his authority against the proposition that cases like the one at bar lie within the equitable jurisdiction, unless jurisdiction is given by statutory or constitutional provisions. It is observable that, in treating the question, he has in mind a court in this country, invested with an equitable jurisdiction measured exactly by that *exercised* by the English court of chancery "at the time of the settlement of this country." With his usual accuracy, he states how the English chancery court dealt with the question at that time, and arrives at the conclusion that said court did not then exercise the jurisdiction in question. But he goes further, and lays down the proposition that "there is no one head of equity power to which, by analogy, this can be said to belong." If it is meant, in view of the right involved, and the relief obtainable through common-law courts, that there is no analogy, when the principles of equity are considered, by which the case would come within the equitable jurisdiction, upon the same principles as many cases come within that jurisdiction, we cannot subscribe to his views. It is fair to say, however, as to Mr. Bishop's views, that he at all times, in treating this subject, reasons from the proposition that to enforce the right of the wife to support, who by the wrongful conduct of her husband is compelled to live separate and apart from him, is equivalent to, and in fact amounts to, the granting of a divorce *a mensa et thoro*. From this position he asserts his conclusion that there is no analogy which would bring the case under any head of equitable power, and draws a very striking picture of a court, admittedly without any jurisdiction in a certain case, arbitrarily holding the alleged offender, and, "dodging all difficulties," administering a drastic remedy for an alleged wrong. (Bishop on Marriage and Divorce [6th ed.], § 356.) With great deference to the learned author, and admiration for the method and discrimination generally employed by him in the treatment of subjects of the law to which he has devoted his labor, we are unable to adopt his conclusion until we find reason to adopt his premise, that merely to compel the husband, who wrongfully abandons or drives away his wife, to support her, is in fact granting her a divorce *a mensa et thoro*. This is the difficulty which must be either confronted with attention and fairly treated, or "dodged." He states the

proposition in this way: "A divorce from bed and board given to the wife concludes with the same decree for alimony which this proceeding does. But it also contains a finding and a judgment, not that the marriage is dissolved, but that she who is to be alimented is entitled, by reason of the fault of the other party, to live in separation. In the proceeding under consideration, a court acknowledging itself without power to adjudicate the right to live in separation—for that would be simply and exactly to pronounce a divorce from bed and board ·—undertakes to make a permanent order for alimony. And yet, as foundation for the order, it passes upon, without reducing to record, the very question of right which it admits not to be within its jurisdiction." (2 Bishop on Marriage and Divorce, § 356.) As long as courts of equity are induced to admit that this proceeding is equivalent to granting a divorce from bed and board, no doubt the jurisdiction will be denied. Let us, therefore, examine this proposition. In every case (where the husband and wife are living separate and apart) in which the common-law courts give judgment for necessaries furnished the wife by third persons, one of the facts upon which the judgment rests is that the wife has just cause for living in separation from her husband during the time in question, when such necessary supplies were furnished. (See cases from common-law courts, and other authorities cited, *supra.*) Now, may it not be said with quite as much force that in these ·cases the common-law courts (admittedly without any jurisdiction to authorize the spouses to live separate and apart) do by their judgments confirm the proposition that during the time in question the wife had good cause for living in separation from her husband? In the case of *Liddlow* v. *Wilmot, supra,* brought in the common-law court by a third person, against a husband, for necessary supplies furnished his wife while she was living separately from him, Lord Ellenborough said: "The first question for consideration is whether the defendant ·turned his wife out of doors, or by the indecency of his conduct precluded her from living with him; for then he was bound by law to afford her means of support adequate to her station." In *Hultz* v. *Gibbs,* 66 Pa. St. 360, the same doctrine is stated as follows: "When a husband turns his wife out of doors, without

any reasonable or just cause, or forces her to withdraw from him, without any means for her support, the law implies that he has given her credit to supply herself with such necessaries as are suitable and proper for her to have, namely, clothing, boarding, lodging, and the like. Her condition would be deplorable, indeed, if this were not so, because of her inability to contract for such things, and to obtain them, if she happens to have no separate estate. When, therefore, necessaries are furnished to a wife so situated, on the credit of her husband, the party claiming to be paid for them must bring himself, in order to recover for them, within the rule stated. He must make out a case which shall negative all idea of a captious, voluntary abandonment of the husband's domicile, and show that she has either been turned out or forced to leave his residence. ( *Walker* v. *Simpson,* 7 Watts & S. 85; 42 Am. Dec. 216, and the authorities therein referred to.)" Declarations of this doctrine could be quoted by great number from the common-law courts. (See cases *supra.*)

So the common-law court must try the question whether the wife was abandoned without cause, or compelled to withdraw and live separately. In other words, these conditions must be shown before judgment can be given in favor of a third party for necessaries furnished her living separately from her husband. Then, is not the judgment in such case an affirmation by the common-law court that the wife had just cause for living in separation? And, if the conditions thus judicially affirmed as sufficient ground still exist, such judgment would not be far from judicially sanctioning her continuance of the separation. It would at least affirm indirectly that as long as the cause for separation, which was adjudged sufficient, existed, she would be justified in living separate and apart. Yet the jurisdiction of the common-law courts to give such judgments does not appear to be questioned on the ground that the same amounts to adjudging the wife justified in living apart from her husband, which, if decreed in terms, would amount to a decree of divorce *a mensa et thoro.* The proposition, however, is held up before the equity court as an all-sufficient "difficulty," whenever it is called upon to do, in a more adequate, direct, simple, and just manner, the very thing which the common-law court fearlessly

attempts.  But does the judgment or decree, whether of common-law or equity court, simply compelling the husband to continue to support his wife when he has, without cause abandoned her, amount to a divorce from bed and board?  We have seen that she must be fully justified in her separation, and that justification must be shown before either the common-law or equity court will give relief.  But the proposition that such inquiry, and the giving of relief, is equivalent to the granting of a divorce from bed and board, it would seem, must involve the common-law court in the same embarrassment as Mr. Bishop has attempted to draw the equity court into whenever it affirms that it lies within the equitable jurisdiction to grant such relief.  Is there anything in the proceeding, whether in the common-law or equity court, which authorizes the spouses to live separate and apart, or authorizes the delinquent husband to continue his neglect, without cause, to provide for his wife?  Is not the wrongful conduct of the husband, instead of the proceeding whereby a court compels him to support his wife, the only justification she has for her separation?  And is there anything in the proceeding either authorizing the husband to continue his wrongful conduct, or fail to resume the voluntary discharge of his marital duties?  Is there anything in the proceeding which merely compels him to support his wife, in the nature of casting an obstacle in the way of his seeking reconciliation with her, and resuming the voluntary discharge of his marital obligations?  It is within the power of courts of equity to make their decrees in all such cases subject to such modifications as circumstances may demand; and it is worthy of consideration whether the actual effect of a just and proper exercise of such jurisdiction would not tend to induce reconciliation by checking the husband in his wilful and unjustifiable abandonment of his marital obligations.  The proceeding, it would seem, simply checks the husband in his attempt to entirely abandon his obligation, without sanctioning the separation any further than inquiring whether it is enforced by the husband's conduct, the same as done in common-law courts, and without placing the slightest obstacle in the way of reconciliation.  These considerations are in no way suggested as furnishing the reasons upon which to base an answer to the

question whether the equity courts of this State possess the jurisdiction in question. They are brought to view in connection with the proposition asserted by some, as we have seen, that to grant such relief is equivalent to, and in fact includes, the decree of divorce *a mensa et thoro*. But we are inclined, after much reflection, to regard the proposition as untenable. When the whole nature and effect of the relief are considered, it appears to be an extreme view, born of a zealous advocacy of one side of this disputed question of jurisdiction.

We will close the inquiry upon this branch of the case by bringing to view certain statutory and constitutional provisions of this State, which to some extent, we think, should influence our determination. The statute provides that: "Women shall retain the same legal existence and legal personality after marriage as before marriage, and shall receive the same protection of all her rights as a woman which her husband does as a man; and for any injury sustained to her reputation, person, property, character, or any natural right, she shall have the same right to appeal in her own name alone to the courts of law or equity, for redress and protection, that her husband has to appeal in his own name alone." (§ 1439, div. 5, Comp. Stats.) Our Constitution provides that "the District Courts shall have original jurisdiction in all cases at law and in equity, . . . . and for such special actions and proceedings as are not otherwise provided for." (§ 11, art. viii.) And, further, that "there shall be but one form of civil action, and that law and equity may be administered in the same action." (§ 28, art. viii.) And, further, that "courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character, and that right and justice shall be administered without sale, denial, or delay." (§ 6, art. iii.) This latter provision was, we think, set before the courts, by the framers of the Constitution, as a tenet for consideration in a case like this, where clearly there is an established right existing, subject to judicial enforcement, and the question is raised on purely artificial grounds, as to whether such right shall be enforced in such an action and in such jurisdiction as by its practice and methods of procedure can insure an appropriate, just, and adequate relief, or whether there shall be a

denial of such appropriate and adequate remedy as the courts can afford. It is admitted that the right exists, and it is contended there is a remedy at law; but we have seen that in many cases that answer would be but a mockery to the aggrieved, in her unjust abandonment. The court is then confronted with the question whether there shall be a denial of enforcement of this right, except where absolute divorce is granted. We think the intendment of our Constitution and statutes is to negative that proposition. With these provisions before us, in addition to the grounds of equity jurisdiction considered, we are drawn to the conclusion that our courts are invested with a jurisdiction broad enough to give proper and adequate remedy for the enforcement of the right in question, in proper cases, where it is shown that such jurisdiction ought to be exercised, and that such remedy lies within the equity jurisdiction of our District Courts.

The second proposition of law to be determined in this case will be developed by a brief statement of facts set forth in plaintiff's complaint. Among other things, it is alleged that plaintiff and defendant intermarried on or about the ninth day of September, 1879, at Watkins Glen, Schuyler County, State of New York, and lived together as man and wife until October 24, 1886; that from September, 1882, until October, 1886, they resided in the city of Helena, Territory of Montana; that in May, 1887, defendant without any cause or provocation on the part of plaintiff, wilfully abandoned and deserted her, and compelled her to live separate and apart from him; that, from the last date up to about seven months prior to the commencement of this action, defendant contributed the sum of fifty dollars per month, and at times seventy-five dollars per month, for plaintiff's support; that, for about seven months last past, defendant has neglected and refused, and still refuses, to furnish plaintiff any money whatever, and that she is now wholly without means of support, and is entirely dependent upon her personal exertions and the contributions of her friends for support of herself and infant son, the issue of said marriage, now in plaintiff's care and custody. That about April 24, 1887, at the city and State of New York, defendant, by threats and menaces (particularly alleged and described), compelled plaint-

iff to write and sign, as dictated by defendant, a letter of authority addressed to E. D. Weed, Esq., an attorney at law, residing, and engaged in the practice of law, at the city of Helena, Territory of Montana, authorizing him to appear as her counsel in an action which defendant proposed to commence against her to obtain a divorce from the bonds of matrimony existing between plaintiff and defendant; that when defendant had thus compelled the writing of said letter by plaintiff, he took the same into his possession; that thereafter plaintiff requested defendant to destroy said letter, and that he then told plaintiff, in order to deceive and defraud her, that he had destroyed said letter, but that, contrary to such statement, defendant retained said letter in his possession, and thereafter presented the same to said attorney, and told said attorney that plaintiff desired said letter to be delivered to him, and desired him to appear for plaintiff, and "represent her in a divorce proceeding to be commenced by the defendant"; that thereafter said attorney appeared as counsel for this plaintiff in an action commenced in the District Court of the Fourth Judicial District of the Territory of Montana, within and for the county of Yellowstone, by defendant herein against this plaintiff, to obtain a divorce from her; that such proceedings were had in said action as resulted in defendant obtaining from said court a decree of divorce from this plaintiff. Plaintiff further alleges that she did not appear in said action, nor had any knowledge of the fact that said attorney had appeared for her therein.

Respondent interposed a demurrer to this complaint, which was sustained by the court, and plaintiff appealed from that order.

Appellant's counsel succinctly state their position on this branch of the case as follows: "Are the parties hereto husband and wife? Is said decree void or voidable? If void, we will then claim that plaintiff is the wife of defendant, and is entitled to maintain this action. If voidable, then we concede that we are premature in our action."

It is not contended by appellant that the decree of the territorial District Court, dissolving the bonds of matrimony which theretofore existed between plaintiff and defendant, is void for any reason that appears on the face of such decree. It was

pronounced by a court of general jurisdiction, and of special statutory jurisdiction of actions for divorce. (Comp. Stats. div. 5, § 1000.) Moreover, by appellant's own showing in her complaint, it appears that said court had jurisdiction of her person, by her appearance through her attorney, duly and expressly authorized by letter. (Code Civ. Proc. §§ 80, 491.)

This decree must be regarded, of course, as if pronounced by a court of this State, as the transformation from territorial to State form of government is for many purposes to be considered as a continuity of government. (Const. art. xx. § 2.)

The theory of appellant's counsel is that the judgment is void, not by reason of any fact appearing on the face of the proceedings, but by reason of the facts pleaded as to the conduct of defendant, which led up to the court obtaining jurisdiction to grant said decree. They contend that, by reason of those facts pleaded (which are deemed admitted on demurrer), it is shown that the court had no jurisdiction over the person of appellant, who was defendant in said proceedings for divorce. On this premise they submit "that wherever want of jurisdiction over the person of defendant is shown, the judgment rendered without such jurisdiction is absolutely void, and is a nullity, and that this want of jurisdiction may as well be shown by evidence *aliunde* the record as from the face of the record; that in either case, if this want of jurisdiction is shown, the decree is absolutely void, and of no force or effect."

It seems to us that, if such a premise be followed, it would sweep away all distinction between judgments void for reasons manifest on the face of the record, and those which, as appears by the record, are valid, and must be given full faith and force until impeached in a proper proceeding, by establishing facts *aliunde* the record, sufficient for that purpose. While there is much conflict relating to certain questions of law concerning judgments, we think it may be safely said to be almost uniformly settled now that domestic judgments of courts of general jurisdiction, valid on their face, cannot be collaterally attacked in courts of the same State, by showing facts *aliunde* the record, although such facts might be sufficient to impeach the judgment in question if brought to bear upon it in a proper proceeding. The proposition in this case appears to be, to open a way through

said decree of divorce for the progress of this action, by going back of that judgment, and raising a question as to the good faith and lawfulness of the plaintiff's conduct in obtaining it. Such a practice cannot be sustained. It is needless to go into a discussion of the reasons, and the public policy which forbid such a rule. These are fully developed in the authorities. (Freeman on Judgments, §§ 116, 128; 1 Black on Judgments, §§ 170, 270; *Hahn* v. *Kelly,* 34 Cal. 391; 94 Am. Dec. 742; *Carpentier* v. *City of Oakland,* 30 Cal. 440; *Granger* v. *Clark,* 22 Me. 128; *Penobscot R. R. Co.* v. *Weeks,* 52 Me. 456; *Prince* v. *Griffin,* 16 Iowa, 552; *Callen* v. *Ellison,* 13 Ohio St. 446; 82 Am. Dec. 448; *Coit* v. *Haven,* 30 Conn. 190; 79 Am. Dec. 244; *Clark* v. *Bryan,* 16 Md. 171; *Wingate* v. *Haywood,* 40 N. H. 437; *Galpin* v. *Page,* 1 Sawy. 309; *Horner* v. *Doe,* 1 Ind. 130; 48 Am. Dec. 355; *Baker* v. *Stonebraker,* 34 Mo. 172; *Reed* v. *Pratt,* 2 Hill, 64; *Harshey* v. *Blackmarr,* 2 Iowa, 161; 89 Am. Dec. 520. See, also, a late case from Oregon, *Morrill* v. *Morrill,* 20 Or. 96, published in 23 Am. St. Rep. 95, with an elaborate note by Mr. A. C. Freeman, editor, and also author of Freeman on Judgments, citing many cases upon the subject.)

Upon the view that said decree was not void, but only voidable in a proper proceeding for that purpose, the court sustained respondent's demurrer, and in our opinion the ruling is correct. The judgment will therefore be affirmed.

*Affirmed.*

BLAKE, C. J., and DE WITT, J., concur.